■ In the Matter of MARJORIE J. ROZELLE, Appellant, v HARRY W. ROZELLE, Respondent. PETER W. HILL, as Law Guardian, Appellant. (And Another Related Proceeding.)—Yesawich Jr., J. Appeal from an order of the Family Court of Delaware County (Estes, J.), entered May 6, 1991, which, *inter alia,* dismissed petitioner's application, in a proceeding pursuant to Family Court Act article 6, for custody of the parties' child.

Shortly after the parties separated when respondent moved out of the marital home in December 1986, their youngest child, Jonathan, began to act in an angry and destructive manner. In August 1987 Jonathan went to live with respondent. According to petitioner, the custody change was

prompted by the recommendation of a therapist and was only temporary.

In July 1988 respondent commenced an action for divorce and, by order dated September 1, 1989, Supreme Court made a temporary custody award in accordance with the existing arrangement, whereby respondent had custody and Jonathan visited with petitioner every other weekend. The divorce action was dismissed, on the merits, in May 1990 and all custody issues were referred to Family Court.

Petitioner commenced this proceeding for custody of Jonathan, the parties' only minor child, in July 1990 and respondent cross-petitioned for similar relief. Evaluations of the parties were conducted by a local mental health clinic and the probation department, both of which found the parties fit and recommended that physical custody of Jonathan remain with respondent to avoid the problems associated with the lack of stability inherent in any change of custody. Family Court conducted a fact-finding hearing at which testimony was taken from the parties, one of Jonathan's sisters, and Jonathan's elementary school principal. A *Lincoln* hearing was also held, at which Family Court and the Law Guardian asked Jonathan a number of questions relevant to the custody issue. The Law Guardian submitted a report in which he recommended that custody be awarded to petitioner because her parenting style seemed more likely to provide Jonathan with opportunities for growth, development and the pursuit of independent interests. Family Court awarded the parties joint legal custody, with physical custody to respondent and liberal visitation to petitioner. Petitioner and the Law Guardian appeal from the order.

Family Court found that although both parties had parenting deficiencies, neither was unfit and neither party was less fit than the other to have custody. Family Court also found that Jonathan appeared to be thriving in the care of his father, and the court disagreed with the Law Guardian's conclusion that the beneficial effect of changing custody to petitioner outweighed the disruptive effect that such a change would have. Instead, Family Court concluded that a custody order providing more particular structure within the framework originally constructed by the parties would serve Jonathan's best interest. Although fully mindful that Family Court's factual findings are generally accorded great deference *(see, Cochran v Cochran,* 177 AD2d 818), we are nonetheless unable to agree that continued physical custody with respondent is in the child's best interest.

"Primary among the circumstances to be considered in determining the best interests of the child are the ability to provide for the child's emotional and intellectual development, the quality of the home environment and the parental guidance provided" *(Matter of Louise E. S. v W. Stephen S.,* 64 NY2d 946, 947). While the prior placement arrangement is an important factor, it is not conclusive *(Eschbach v Eschbach,* 56 NY2d 167, 171; *see, Johns v Johns,* 156 AD2d 777, 778). And, it is not without significance that Jonathan's previous placement with respondent, formalized by Supreme Court's September 1, 1989 order, was the product of the parties' stipulation (no evidence having been received), was prompted by a therapist's recommendation to petitioner and was intended to be temporary *(see, Friederwitzer v Friederwitzer,* 55 NY2d 89, 94-95). Furthermore, the mental health clinic and probation department evaluations, recommending continued physical custody with respondent, focus primarily on the need to maintain stability and to avoid the disruption of change in Jonathan's life and were written prior to Family Court's fact-finding hearing and without the benefit of the testimony elicited therein regarding respondent's method of disciplining Jonathan and his indifference to Jonathan's life outside of school.

Particularly disturbing is respondent's testimony that he uses "the belt" on Jonathan every two or three months for "any one of a dozen every-day disciplinary problems" or to "discourage [Jonathan's] whining and bawling" and that he will continue to do so until he is able to communicate with Jonathan, a feat he admits never having accomplished with the parties' other three grown children. This use of corporal punishment in place of communication is in sharp contrast with petitioner's reaction to Jonathan's acting out, that is of embracing the boy, who is now 8 years old, until he calms himself and can finally talk. Especially relevant in this regard is the testimony of one of Jonathan's sisters that, while petitioner allowed her to express her feelings, including anger, and disciplined her by grounding her or sending her to her room to "sit there for a couple of hours to think about it and then * * * [they'd] talk about it", respondent used "the belt" on her, that she "was so afraid of dad", that as a result of his control she "didn't feel like a person", and that to escape from it she ran away several times when she was a teenager.

Also troubling is Family Court's finding that Jonathan "appears to be thriving in the care of his father". Indeed, respondent conceded that Jonathan was not participating in

any organized extracurricular activities, including the school's yearly open house, the Cub Scouts, Little League and Pop Warner football (activities which Jonathan's school principal described as "extremely important"), which petitioner actively supports and in which Jonathan has indicated an interest. The record evidence also reveals that petitioner and Jonathan share an active relationship, including going to church, walking and fishing, while respondent's relationship with Jonathan centers largely on watching television.

These circumstances in combination with the Law Guardian's recommendation that Jonathan's "emotional and social development will be aided by his being with his mother, whereas it will be restricted by the father", lead us to conclude that physical custody of Jonathan should have been transferred to petitioner.

Mikoll, J. P., and Crew III, J., concur.

Casey, J. (dissenting). There is ample evidence in the record to support Family Court's finding that although both parties are fit, they have parenting deficiencies and that Jonathan's best interest would not be served by transferring physical custody to petitioner. It is our view that the majority has used selected portions of testimony in the record to portray the parties' parenting practices in a manner that is unsupported when the record is considered as a whole, a portrayal which conflicts with the findings of the Trial Judge who observed the witnesses as they testified, and with the conclusions of the mental health and probation officials who evaluated the parties and Jonathan.

As to the use of corporal punishment once every two or three months, respondent explained: "I use a belt as a fast warm discipline. I don't believe in punishing the kid for five or six hours by making them go to their rooms. I don't believe in it. Discipline should be now, it should be over with. With love and affection afterward. * * * When we're talking about the belt, we're talking about a controlled action. We're not talking where I take off my belt, leave welts and stuff like this on my child. * * * I strike him on the rear end. * * * Once. Maybe twice. * * * It's more or less a [sic] symbolic. It's a ritual. When I take off my belt I'm serious." Respondent does not rely exclusively upon corporal punishment but also disciplines Jonathan by restricting his outdoor play or his access to television.

As to respondent's inability to communicate with his older children, he attributes the problem to his prolonged absences

during his 20-year stint in the Navy, from which he has retired. According to respondent, his efforts at disciplining the older children were often instigated by petitioner's complaints about how the children acted while he was away. Family Court found that respondent's conduct toward Jonathan is significantly different than his conduct toward the older children when he and petitioner lived together.

Although the majority apparently finds petitioner's parenting style to be preferable to that employed by respondent, it is undisputed that Jonathan was unruly and destructive after respondent left the marital home, and petitioner's inability to control Jonathan was the reason for the voluntary change in custody from petitioner to respondent in August 1987. According to respondent, although Jonathan was unruly and unmanageable when the child first came to live with him, he now has no discipline problems with Jonathan. There is also evidence in the record that petitioner seems to be preoccupied with respondent's lifestyle, which takes away from her ability to focus upon what is best for Jonathan.

Family Court's finding that Jonathan "appears to be thriving in the care of his father" is supported by the only evidence in the record on the issue, and Family Court had the opportunity to observe and interact with Jonathan firsthand at the *Lincoln* hearing. As to Jonathan's extracurricular activities, there is evidence in the record that he participated in Cub Scouts for a period of time until he lost interest and that respondent takes Jonathan camping and swimming.

In sum, the record is replete with conflicting evidence which, when taken out of context, can easily support an award of custody to one party or the other. Family Court, however, focused upon the totality of the circumstances and based its findings and conclusions upon all of the evidence in the record, considered as a whole. It is, therefore, our view that this is an appropriate case for according deference to Family Court's resolution of the custody and visitation issues raised in this proceeding (*see, Cochran v Cochran*, 177 AD2d 818). We would accordingly affirm Family Court's order.

Mercure, J., concurs. Ordered that the order is reversed, on the facts, without costs, petition granted, cross petition denied and matter remitted to the Family Court of Delaware County to determine appropriate visitation for respondent.