Matter of Guy M. v Yolanda L.-F. (2004 NY Slip Op 51340(U))

[*1]

Matter of Guy M. v Yolanda L.-F.

2004 NY Slip Op 51340(U)

Decided on November 8, 2004

Family Court, Orange County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 8, 2004

Family Court, Orange County
In the Matter of a Proceeding under Article 6 Of the Family Court Act, GUY M., Petitioner,
 against
YOLANDA L.-F., Respondent.
V-O6599-03/04A

Carol S. Klein, J.
BACKGROUND
Mr. Guy M. and Ms. Yolanda L. are the parents of Chavonne M. born April 1, 1992. Although the parties had a prior relationship, they were never married. The relationship ended prior to Chavonne being born and while pregnant, Ms. L. married James Faulkner, her current husband. Sometime in 1992 after Chavonne was born, Ms. L. notified Mr. M. about his daughter and once the child turned one (1) he took a paternity test. The test proved him to be Chavonne's father and an order of filiation was entered. During the first two or three years of Chavonne's life, she resided with her mother. At one point, Ms. L. moved to North Carolina with Chavonne to be closer to Mr. M.'s mother. In 1995, Ms. L. returned to New York State and Mr. M. obtained legal custody of Chavonne. Chavonne has resided with her father in New York State since then and only recently did she reside with her mother on a temporary basis.
Although Mr. M.'s initial order of custody of Chavonne was on consent, after 1995 there was continuous litigation between the parties in Westchester County Family Court initiated by Ms. L.. In fact, there was extensive history between the parties in Westchester Family Court prior to this Court being involved. The permanent order of custody was issued on consent of the parties in May of 1995, and modified on consent in October of 1995. In 1997, the prior orders were again modified (on consent) to expand Ms. L.'s visitation schedule. In January of 2000, the order was once again modified on consent to change the visitation schedule. The Court notes that all modification and/or violation petitions filed throughout the years were initiated by Ms. L..
In December of 2003, Ms. L. filed a petition here in Orange County. At that time Mr. M. and his family were residing in Washingtonville, New York. Ms. L. sought a change of custody and filed a family offense petition alleging physical abuse by Mr. M. against Chavonne. This Court, based upon Ms. L.'s (ex-parte) allegations and testimony in connection with her family [*2]offense petition temporarily modified custody and issued a Temporary Order of Protection. A CPS investigation was ordered to investigate Ms. L.'s very serious allegations of physical abuse against Chavonne by her father.
The Court has three petitions to consider in this matter. The first petition filed by Yolanda L. seeks to modify the most recent order of custody dated January 7, 2000 which was issued by the Westchester County Family Court. That order continued legal custody of Chavonne M. with her father, Guy M. with visitation to Ms. L.. The second petition seeks a permanent order of protection against Mr. M. on behalf of Ms. L.. That petition is addressed under a separate decision and order. The final petition filed by Mr. M. seeks an order restoring and maintaining permanent legal custody to him.
The matter came on to be heard before this Court and both parties appeared personally, and by their respective counsel. Ms. L. was represented by John E. Bach, Esq., and Mr. M. was represented by John C. Guttridge, Esq., Chavonne was represented by the Children's Rights Society, Inc., (Linda Pierson DaSilva, Esq., of counsel).
 The Court heard testimony from several witnesses including Ms. L. and Mr. M.. An in camera interview of the child was also conducted.
At the time that Ms. L. initially appeared in this Court, she was residing in Brooklyn, New York and Mr. M. was residing in Washingtonville, New York. Chavonne was in 6th grade at the Taft Middle School. In December 2003, Chavonne was transferred from Taft to school in Brooklyn, New York, until January 2004 when she and her mother relocated to Edison, New Jersey without permission from this Court, and in violation of this Court's prior order precluding her from removing the child from the jurisdiction of this Court.
 In October of 2004, Mr. M. retired from his employment in New York State and relocated to North Carolina. As set forth above Mr. M. has an application before this Court seeking that Chavonne be returned to his custody in North Carolina.
 For the reasons set forth herein, the Court finds that it would be in Chavonne's best interest to be returned to the custody of her father and to be allowed to relocate to North Carolina.
APPLICABLE LAW
MODIFICATION PETITION OF MS. L.
The court is mindful of the body of law which provides that custody, once fixed by agreement or order, should not be lightly shifted from one parent to another (Sorrentino v. Sorrentino, 122 AD2d 604; Richman v. Richman, 104 AD2d 934). While adherence to a prior agreement or order will advance the concept of stability, at the same time, the court has an overriding and continuing obligation to do what it believes to be in the best interest of the children coming before it (Eschbach v. Eschbach, 56 NY2d 167, 171-172; Friederwitzer v. Friederwitzer, 55 NY2d 89; see also, Allen v. Farrow, 197 AD2d 327, 333; Matter of Rozelle v. Rozelle, 184 AD2d 973; Matter of Patsy M.C. v. Lorna W.C., 165 AD2d 813, 814).
That a change in custody may prove temporarily disruptive to the children is not determinative, for all changes in custody are disruptive ((Matter of Louise E.S. v. W. Stephen S., 64 NY2d 946, 947; Matter of Nehra v. Uhlar, 43 NY2d 242).
However, to warrant a change in custody there must be a showing of sufficient material change in circumstances manifesting that the best interests of the children will only be met if [*3]such a change is made (see, Brynn UU v. Erin I, 220 AD2d 830; Tracy V. v. Donald W. (220 AD2d 888; Thaxton v. Morro, 222 AD2d 955; Matter of Brocher v. Brocher, 213 AD2d 544, lv. denied, 86 NY2d 701; Matter of La Valley v. La Valley, 199 AD2d 896, 606 NYS2d 349). And in considering whether a change in custody is warranted the court must consider the totality of the circumstances. (Morton v. Morton, 158 AD2d 458). ; Matter of Katz v. Evans, 199 AD2d 940, 941).
At the time Ms. L. appeared before this Court on her family offense petition seeking an order of protection, she made very serious allegations of physical danger to Chavonne. Accordingly, this Court took steps to ensure the child's safety. A CPS investigation was ordered, completed and came back unfounded. However, during the interim a temporary order of custody was granted to Ms. L..
RETURN OF CUSTODY APPLICATION AND RELOCATION OF MR. M.
In Tropea v. Tropea 87 NY2d 727 (1996), the Court of Appeals defined the manner in which relocation cases are to be decided. Rejecting the various formulas and presumptions which had been suggested by lower appellate courts in the past, the Tropea Court held that "each relocation request must be considered on its own merits with due consideration of all the relevant facts and circumstances and with predominant emphasis being placed on what outcome is most likely to serve the best interest of the child." The respective rights of the custodial and non-custodial parents, while still recognized as significant factors, were made subservient to the rights and needs of the child. In summarizing its holding the court noted that "in all cases, the courts should be free to consider and give appropriate weight to all of the factors that may be relevant to the determination. In the end, it is for the court to determine, based on all of the proof, whether it has been established by a preponderance of the evidence that a proposed relocation would serve the child's best interests."
Any determination depends to a very great extent upon the court's assessment of the credibility of the witness and of the character, temperament and sincerity of the parties (Canazon v. Canazon, 215 AD2d 652, lv. denied, 86 NY2d 710; Kuncman v. Kuncman, 188 AD2d 517, 518). Here the Court had the unique opportunity to assess the credibility of the witnesses, and the character, temperament and sincerity of the parties, and has taken steps to ensure that the best interests of Chavonne are preserved.
The Court notes at the outset that the child has primarily resided with her father, Mr. M. for most of her life. He obtained legal custody of her in 1995 when she was three years old. She is now 12 years old and only recently within the past year, on a temporary basis has Chavonne resided with her mother. At the time Mr. M. filed he was not specifically seeking to relocate but merely to restore custody to him. However, because of the change in circumstances —her move to New Jersey, his move to North Carolina, the Court considered issues relevant to relocation.
FACTS
The court heard testimony from Ms. L. in support of her case as well as from the Assistant Principal of Taft Elementary School in Washingtonville, and from Navae M., and Guy M. in support of Mr. M.'s case. The Court also interviewed Miss Chavonne M. in camera. The following documents were admitted into evidence at the trial; Letters to Mr. M. and his wife, from the Office of Children and Family Services notifying him that a CPS report filed against him was unfounded; Washingtonville School Records showing various infraction reports filed [*4]against Chavonne as well as an incident report; other school records pertaining to Chavonne M.; and several pictures of Mr. M.'s new home in North Carolina.
The instant proceeding was apparently precipitated by an incident that occurred in June of 2003 while Chavonne was attending Taft Elementary School in Washingtonville, NY. The Court heard testimony from Ms. L.'s witness Mary Valentine Callahan the Assistant Principal of Taft Elementary School. She reported that an incident occurred in June of 2003 that she called into the child abuse hotline which involved Chavonne appearing to be despondent and sad, stating that she wanted to live with her mother. Ms. Callahan indicated that she feared the child was going to harm herself. In response to this incident Mr. M. was not called, but Ms. Callahan indicated that she gave the child her card and told her to have Ms. L. contact her. This incident was cited in Ms. L.'s petition.
The court heard testimony from Ms. L. who indicated that although the incident took place in June and Ms. Callahan notified her- she did not file for a change in custody until November 2003 when she became aware that Mr. M. was moving to North Carolina.
After obtaining a temporary order of protection and a temporary order of custody, Ms. L. enrolled Chavonne for a short period of time in school in Brooklyn at the John Wilson Middle School. However, soon after the holidays, Ms. L. moved to Edison New Jersey with Chavonne in violation of this Court's order directing that the child not be removed from the jurisdiction of this Court. When asked about this Ms. L., indicated that "she is not a lawyer" and did not know that she could not move to New Jersey. She stated that she did not know New Jersey was not in the jurisdiction of this court. She claims that she did notify both the Law Guardian and Mr. M., but admits she did not get court approval. Ms. L. testified that she moved to New Jersey to provide her daughter with a better school district, child care, and opportunities.
Once in New Jersey, Chavonne was enrolled in the Herbert Hoover Middle School for the remainder of her sixth (6th) grade. While there, the child experienced disciplinary problems, engaged in fighting, and had difficulty getting her homework done on a regular basis. It was reported that Chavonne became belligerent, and began having behavior problems and problems with authority figures. In addition, Chavonne's grades were not good, she began receiving before and after school help. However, Ms. L. testified that now that Chavonne had come to live with her "she is happy," and she has friends who come to her house and she goes to theirs.
Prior to leaving John Wilson Intermediate School in Brooklyn, Chavonne was failing 3 classes with a 55 average and had no grade in another class.
 Ms. L.'s testimony further revealed that Chavonne has been disciplined for insubordination while in the Middle School and was cutting classes and engaging in hazardous behavior. Additionally, Chavonne was suspended from school for three days for using profanity to the Assistant Principal.
It was undisputed that in 3rd, 4th & 5th grade Chavonne did very well academically. She had high test scores, few absences and turned in her homework on time. Ms. L. stated that she was not aware of Chavonne's 3rd, 4th grade teachers but knew her 5th grade teacher, Ms. Mahern. 
Ms. L. advised the Court that while Chavonne was residing with her, she became aware of Chavonne's use of the computer. Ms. L. indicated that she implemented parental controls on the computer for "12 and under" but Chavonne managed to access adult chat rooms. She discovered the child had been entering adult chat rooms claiming to be 17 (although she is only [*5]12) and communicating with 19 and 20-year-old males. Chavonne used a screen name "Cutievonc08" and Ms. L. testified that she discovered three emails in August 2004 from Chavonne purportedly to her boyfriend "NELLi21." The emails indicated that Chavonne was going to Ms L.'s sister's house to meet "NELLi21." Ms. L. indicated that indeed Chavonne snuck out of her home and met a 20-year-old man. Ms. L. believes that her daughter is sexually active but expressed her concern that Chavonne was chatting with kids who have drug problems.
Ms. L. offered no testimony from her husband, James L. with whom she resides and is married to. Nor did she offer any insight into her living accommodations, the community surrounding, her and Chavonne's daily routine, schedules nor did she discuss her specific parenting plan. She did not offer any specific visitation schedule that would be available for Mr. M. should custody be awarded to her. In fact, she offered little or no credible testimony which would lead this Court to believe a change of custody would be in Chavonne's best interest.
Mr. M.'s current wife of six years, Navae M. testified. She stated that she and Mr. M. have lived together for eight years, but that she has known him for 13 years. Ms. M. testified that Mr. M. had custody of Chavonne for nine years. They currently reside in Charlotte, North Carolina with their son, Guy, III, and her daughter Tara.
With regard to Chavonne's relationship with her mother, Ms. M. testified that there was visitation between Chavonne and her mother every other weekend, and if Chavonne asked to stay longer during vacations, summer visitations or extended weekends, Mr. M. would always permit that. It was Ms. M.'s opinion that her husband always fostered a relationship between mother and daughter. However, once Ms. L. obtained temporary physical custody, the same did not hold true for Ms. L.. Mr. M. was not advised as to whom Chavonne's doctors were, her school, her teachers or other developmental milestones. Mr. M. tried to visit with his daughter in New Jersey but she would not come for the visit. In fact, Ms. L. called the police to prevent Chavonne from going to visit her father. In July of 2004 Chavonne finally spent two (2 )weeks in her father's home and, according to Ms. M., was very affectionate toward her father. She telephoned every day since she left in July and continued to do so after another two (2 ) week visit with her father in August.
With regard to their regular routine, Ms. M. indicated that her typical day involves getting up with the kids, dropping them at her mother's house, Jeanette Akland, coming home after school, picking up the children, and making sure they did their homework while she makes dinner. Ms. M. stated that she and/or Mr. M. would check the kids' homework.
Ms. M. testified that the relationship between Chavonne, her younger brother and her step sister, Tara was very positive and that all three got along together.
Prior to residing with her mother, Ms. M. advised that Chavonne's attendance at school was almost perfect every year. Both she and her husband make sure they stay on top of the kids' responsibilities, they look over homework, help with projects, are involved with PTA, and attend parent-teacher conferences. The M.'s make it their place to know all the school officials by name and stay involved in their children's education. This is not to say, however, that Chavonne did not have incidents while at Taft, but generally her attendance there was a positive experience.
As far as Ms. L.'s involvement with Chavonne, Ms. M. indicated she saw her at Chavonne's graduation from 5th grade but for years prior to that did not see her at Chavonne's [*6]school events. She pointed out that two (2) years ago when Chavonne had a homework assignment on the weekend she did not do it while visiting her mother. Instead she had to do her homework at 8:00 p.m. at night when she returned home. Accordingly the M.'s stopped sending Chavonne's homework with her when she visited her mother because it was not getting done.
Ms. M. further testified that her husband does not beat or hit her nor is she afraid of him. He does not use drugs and there are no drugs in the house. Chavonne is treated the same as any of the other children-not differently. Chavonne's punishment for lying or doing something wrong might be the loss of her stereo from her room. Ms. M. insisted that her husband never physically or emotionally abused either her or any of the children.
With regard to the move to North Carolina, they had discussed it as a family over a year before the move. Mr. M. was a manager with Verizon and planned to retire. They thought it would be best for the family.
While Chavonne was residing with him, Mr. M. indicated that he was very involved in her day to day life. He always attended parent-teacher conferences PTA, group things in school for parents, and meets all the teachers. He stated that Ms. L. was not there and she did not attend events. He could only recall two school functions she attended or participated in for Chavonne - - moving up day and a field trip 5th grade year. On the other hand he and his wife assist in and go over the children's homework. They both help the kids with their projects and activities. Mr. M. reiterated that homework was not getting done when Chavonne was with her mother.
Mr. M. testified at great lengths to the safeguards he put on any computer used by Chavonne. On his computer is an administrative password to log into the system and another password to access the internet, filters were employed and Chavonne was strictly supervised when using the computer. There was always someone present at all times when Chavonne came home from school. Mr. M. stated that in his home, Chavonne was not allowed to watch R-rated movies, MTV or watch rap videos as he believes they are too explicit. He stated that Chavonne would come home with rap CDs that she had made at her mothers and would be wearing clothes that were not age appropriate. Mr. M. expressed grave concerns about Chavonne's possible sexual activity as well as the moral values Ms. L. was teaching her daughter.
Mr. M. pointed out that several times, Ms. L. would drive Chavonne home from visits with D. M. a man he believes to be Ms. L.'s boyfriend. Mr. M. advised that Mr. M. is the brother of S.M., point guard for a professional basketball team. He is concerned that Ms. L. is engaging in this extramarital relationship in Chavonne's presence since she refers to Mr. M.'s brother as "Uncle S." and she frequently attends Knicks games. This relationship concerns Mr. M. but when he questioned Ms L. about it she advised him it was none of his business.
With regard to the move to North Carolina, Mr. M. testified he first discussed the move with Ms. L. 2 weeks prior to Thanksgiving 2003-over the phone. He stated that they discussed having Chavonne coming back and forth for long weekends and holidays but clearly Ms. L. was upset. Mr. M. indicated they had five conversations concerning the proposed move.
Mr. M. is currently employed in a commercial cleaning service in Charlotte, N.C. After he retired, he moved to participate in the family business known as Hughes Cleaning. He and Mrs. M. own their own home in Charlotte, North Carolina and he testified in great detail about his family's life in North Carolina. He introduced several pictures of their home in Charlotte into evidence discussing the size and community and the rooms available. He indicated that he lives [*7]in the same area where his mother, sister, mother-in-law, uncle, and several cousins all of whom are within a 20 minute proximity.
 Mr. M. indicated that the Charlotte airport is only 20 miles away from his home, and there are frequent flights to Newark, New Jersey which is 25-30 minutes away from Ms. L.'s residence in Edison. Round trip flights range from $180-$220.
 Mr. M. is well aware of Chavonne's need to spend some time with her mother. He claims that for all the time he had custody he always fostered that relationship. But he is very concerned because Ms. L. has not fostered a relationship with the child and him. For example, Chavonne did not call her father on Thanksgiving 2003, while with her mother. She did call on Christmas, but Mr. M. stated this was the first Christmas since she was born that he did not spend Christmas with Chavonne. After Christmas Mr. M. indicated he did not speak with his daughter for months. In fact, since Ms. L. has had the child in her custody, visits with Chavonne have been troublesome. During the first four months after the change in custody, there was no physical contact and Mr. M. was only able to talk to Chavonne three or four times. He would call and get no answer. When he finally was able to have an unsupervised with his daughter, it was cancelled by Ms. L..
He expressed his belief that Ms. L. imposes upon Chavonne the feeling that she must love her mother and only her mother and if she loves her father she is being untrue to her mother.
In North Carolina, Chavonne would go to the middle school which Mr. M. advised has an excellent college prep program. Mr. M. testified that he is financially able to take care of Chavonne's financial needs. Mr. M. indicates that family issues are discussed at family meetings held at least once a month. This involves getting all the kids together where everyone is given opportunity to speak and express concerns and issues. All the children have specific clean up and household chores. Mr. M. has investigated activities and counseling resources for Chavonne should she return to his home in North Carolina.
CONCLUSION
Historically, Mr. M. has been the primary caretaker of Chavonne. He has a specific parenting plan, monitors her school work, her behavior, her extracurricular activities and with whom she associates. Mr. M. displays responsible parenting ideals and techniques. Some of his methods may not be liked by his 12-year-old daughter, but he upholds good moral and social values in raising his children.
On the other hand, Ms. L. has no specific parenting plan in place. She has not historically been involved in Chavonne's day to day schooling issues or disciplinary issues. Her style is much more liberal and open. When Chavonne was very young Ms. L. took the position that rather than lie to her daughter, she would explain to her, in adult terms, issues about sex. While the premise of her view is common or necessarily condemnable, she misunderstands the relevance of appropriateness. Ms. L. displays little concern with regard to issues such as appropriate dress, age appropriate movies and/or music and age appropriate parental controls.
Under Ms. L.'s watch, Chavonne has undertaken certain activities that have put the child in danger and/or at risk. There is a concern that the child has engaged in sexual relations with a 20-year-old man after having met him on the internet. Chavonne apparently took money from her mother to travel by bus alone to meet her boyfriend in New York City.
 It is fairly well known that the internet has created very serious issues for parents today. [*8]The Court is mindful of many news stories reporting young girls running away from home to meet individuals they have met on the Internet. Moreover, it is common for children to be duped into believing they are communicating with a peer only to find out they are communicating with a sexual predator. As such, parents are faced with taking extraordinary steps to protect their children.
Mr. M., aware of those issues, has implemented numerous parental controls when allowing his children to use the computer. And unsurprisingly, many children today know how to navigate around those controls. Nevertheless, it appears Ms. L. is oblivious to these types of issues.
It is clear to this Court from the testimony and evidence presented, that Ms. L. has poisoned Chavonne against her father to the extent that the child's respect for her father is lacking completely. Unfortunately, Chavonne views her father's discipline and parenting style as controlling of women. This is a powerful impression the Court believes was likely gleaned from statements made by an adult to the child. This is not to discredit the child's intelligence, but it exemplifies the failure on Ms. L.'s part to be mindful of the importance of fostering the child's relationship with her other parent.
Unfortunately, had Chavonne thrived while in her mother's temporary custody, this Court may have been convinced that a change in custody was warranted at this critical time in this young lady's life. The child has acted out in school, been suspended, been disciplined and is failing classes. It is this Court's opinion that Ms L. has failed her daughter. This, sadly is an issue Chavonne will not understand or appreciate until she is much older and perhaps has children of her own. But, Chavonne has not thrived in her mother's care, she has lost a lot of ground in her educational achievements, she has placed her self at risk to any number of dangers possible pre-teenage pregnancy, possible exposure to STDs, and possible exposure to physical harm. Although Chavonne fancys herself as a grown up and able to handle adult issues she is still a child and needs the guidance of an adult who knows how to teach her right from wrong and how to be safe. She is on the cusp of childhood and young adult hood and needs the most guidance at this time. She believes her father is too strict and has too many rules. But on the other hand, her behavior since she has resided with her mother indicates she still needs rules and guidance.
Chavonne's education should be a priority that both parents focus on. Ms. L. did not indicate any relevant concerns for Chavonne's school work or her peer selection. She effectively dismisses Chavonnes poor academics and focuses on her social schedule. Mr. M., on the other hand has always monitored these issues.
It is unclear whether Mr. M. is fully prepared to address the issues a young teenage girl faces and whether or not he is comfortable providing Chavonne with the necessary freedoms she will need over the next few years. The Law Guardian attempted to discredit Mr. M.'s ability to provide the necessary parenting to his daughter by asking him whether or not he had discussed the "birds and the bees" with his daughter. Unfortunately, this young girl is way past the "birds and the bees," an antiquated term that does not even come close to addressing the issues on which both Mr. M. and Ms. L. must be prepared to guide Chavonne. There must be a balance between explaining to a seven-year-old about "sex" and talking about "the birds and the bees" with a twelve-year-old.
Both parents need to educate themselves more about their daughter and her needs. For [*9]example, Mr. M. appears to believe in physical discipline for his children. However, he needs to understand that that is not necessarily an appropriate manner of dealing with a 12-year-old young adult. He must begin to understand that striking another human being out of anger or to teach them a lesson leaves a very different impression on that person. They may not necessarily get the lesson. This Court does not believe that Mr. L. is physically abusive to Chavonne, however that may be the lesson he is teaching his daughter, rather than right from wrong. It is important to the welfare of this child that Mr. L. attends age appropriate parenting classes with or for Chavonne so as to discontinue any misconceptions Chavonne has at this point. The Court is going to direct that both parents refrain from corporal punishment in any form.
The issues this Court faced in this matter were unique. Unfortunately Ms. L. summarily left the State of New York with the child and relocated two hours away from her home in Washingtonville when she obtained temporary custody of the Chavonne. As such, this Court used a different analysis in determining whether or not to continue custody with Mr. M. since he has relocated to North Carolina.
In most circumstances this would require the Court to look more strictly to the several Tropea factors in making its determination. However, this Court takes the position, however, perhaps in an unprecedented posture that Ms. L.'s actions have vitiated the traditional relocation issue of the effect the relocation might have on the child's access to the other parent. The true measurement here is the best interest of Chavonne which can only be served at this time by her father. This is in spite of the fact that the move to North Carolina will strongly impair the mother and daughter's ability to see each other on a frequent (ie. , Every other weekend) basis.
 It was of no concern to Ms. L. what impact her relocation might have on the father/daughter relationship. She has failed to notify Chavonne's father of the school which Chavonne was attending or any other issues concerning the child's welfare after she moved from Brooklyn. There were several months that Chavonne and her father did not speak to each other at all. This Court is of the impression that no matter what, Ms. L. does not and will not foster a relationship between her daughter and her father. On the other hand Mr. M. is strongly of the opinion that a young girl needs her mother and encourages the relationship.
Moreover, Mr. M. has done his homework. He has investigated the schools and counseling programs near his home relevant to Chavonne, and he has investigated flight information to and from Charlotte, NC to Newark, NJ. Both families reside close to large airports making visitation issues that much less difficult. Moreover, he is willing to make the necessary arrangements to accommodate Chavonne's visits with her mother. Ms. L. expressed no specific parenting or visitation plan. Should Chavonne remain with her mother, it is likely, her relationship with her father will deteriorate beyond repair and she will continue down the path of risky behavior. That is too great a chance to take in this case.
Now, therefore, it is hereby
ORDERED, that Ms. L.'s petition under Docket V-06599-03/04A is dismissed in its entirety with prejudice; and is further
ORDERED, that Mr. M.'s application for restoration of custody of Chavonne to him is granted and the prior order is modified as set forth herein; and it is further,
ORDERED, and ADJUDGED that it is in the best interest of Chavonne M. that legal and physical custody be and hereby is granted to Guy M. and he be permitted to remain in North [*10]Carolina; and it is further;
ORDERED, that Ms. L. and Chavonne enjoy the following visitation;
Chavonne will spend one weekend a month with her mother with the cost of such travel being the responsibility of Mr. M. so long as the cost is reasonable and not excessive due to last minute or cancelled plans caused by Ms. L.; and
Chavonne will be permitted to spend the following school vacation periods with her mother;
Winter Break; beginning no later than the day school after lets out for the vacation and returning home no later than the day prior to school recommencing and
Spring Break beginning no later than the day after school lets out for the vacation and returning home no later than the day prior to school recommencing; and
4 weeks in the summer to be determined between the parties as can be agreed upon and if this cannot be agreed upon then the 4 weeks immediately commencing upon the day after Chavonne's last day of school and returning 4 weeks after that; and it is further
ORDERED, that during such visitation Ms. L. shall ensure that Chavonne is properly supervised and it is further
ORDERED, unless legally divorced or separated from their spouses, neither party shall not expose Chavonne to any extramarital relationships he or she may have; and it is further
ORDERED, that once enrolled in school in North Carolina, Mr. M. shall provide Ms. L. with the yearly calendar and notify her of all school activities, events and holidays so as too properly plan her visitation periods with Chavonne; and it is further,
ORDERED, Ms. L. may exercise additional visitation with her daughter in North Carolina upon reasonable notice to Mr. M. of her scheduled arrival in town so long as such visitation does not interfere with previously arranged plans that would be beneficial to Chavonne; and it is further
ORDERED, that in any month where Chavonne has a long weekend that shall be the weekend she shall be entitled to have her monthly visitation with her mother should she wish to do so; and it is further
ORDERED, that during such visits, Ms. L. is to ensure that Chavonne completes all of her assigned homework while with her; and it is further
ORDERED, Chavonne shall enjoy telephone visitations with her mother at a minimum of once a week at reasonable times; and it is further
ORDERED, that Chavonne shall be permitted to have email communication with her mother if same is available; and it is further
ORDERED, that neither party shall use corporal punishment to discipline Chavonne; and it is further
ORDERED, that neither party shall denigrate the other and shall encourage and foster positive relations between the child and other parent; and it is further
ORDERED, that Mr. M. is to immediately enroll Chavonne in counseling with a licensed and certified child psychologist, psychotherapist or psychiatrist to assist her with the transition and issues surrounding the custody and visitation changes; and it is further
ORDERED, that Mr. M. and Ms. L. are to both enroll in a parenting class specifically tailored to address the needs and parenting of young women of Chavonne's age; and it is further
[*11]
ORDERED, that each parent is to complete the parenting class and provide the other parent with a certificate of completion within six (6) months of the date of this order with notice of entry; and it is further
ORDERED, that the failure to abide by the terms of this requirement shall constitute a violation of this Court's order subject to penalties for contempt; and it is further;
ORDERED, that the visitation set forth herein is a minimum and may be modified and/or changed by consent of the parties and in consideration of Chavonne's schedule; and it is further
ORDERED, that any relief requested not specifically addressed herein is denied; and it is further,
ORDERED, that any duly authorized police or peace officer may enforce this Order.
This constitutes the decision and order of this Court.
Dated: November 8, 2004 E N T E R
__________________________
HON. Carol S. Klein, JFC